# EXHIBIT A

## NON-DEDICATED CONTRACT CARRIER
## TRANSPORTATION AGREEMENT

**THIS NON-DEDICATED CONTRACT CARRIER TRANSPORTATION AGREEMENT** ("Agreement"), effective the _12th_ day of _December_, 20 _19_, by and between The Kroger Co., an Ohio corporation, having an office at 1014 Vine Street, Cincinnati OH 45202 - Attention: Transportation (hereinafter called the "Shipper") and _Medallion Transport & Logistics LLC_ a(n) _____LLC_____ corporation [limited partnership, limited liability company], having an office at _701 East Gate Dr., Ste 110 Mt Laurel, NJ 08054_ (hereinafter called the "Carrier").

### W I T N E S S E T H:

**WHEREAS,** Shipper is engaged in the Supermarket business and has distinct and special needs for the transportation of grocery, foodstuffs and general merchandise, and desires to retain Carrier to furnish transportation services by motor vehicle;

**WHEREAS,** Carrier is engaged in the business of furnishing transportation services by motor vehicle and desires to furnish Shipper with its transportation services;

**WHEREAS,** this Agreement is entered into for the mutual benefit of the parties hereto and in a spirit of cooperation;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between the parties as follows:

**1.      TERM OF AGREEMENT**

The term of this Agreement shall begin the _12th_ day of _December_ 20 _19_ ("Effective Date") and shall continue in force until _December 12_____, 20 _20_  The Agreement shall automatically renew for consecutive 12 month periods thereafter, unless earlier terminated as provided herein.

**2.      OBLIGATIONS OF SHIPPER**

2.1.      Shipper agrees to tender to Carrier, and Carrier agrees to accept from Shipper, a series of shipments consisting of grocery, foodstuffs and general merchandise during the term of this Agreement. Such products shall be transported by the Carrier between points within North America, as requested and ordered by Shipper. Each shipment accepted for transportation shall move on a Uniform Bill of Lading or such other document as the parties may agree to use.

2.2.      Carrier agrees to accept Shipper's freight tendered to it by third parties for delivery to Shipper's facilities and to the facilities of all divisions, subsidiaries or affiliates of Shipper, whether owned or leased.  Carrier shall load, unload (if applicable) and deliver the freight promptly and efficiently and strictly in accordance with the terms of this Agreement.

2.3.    Shipper shall pay Carrier the rates and charges specified in Schedule A hereto, which may be amended from time to time. Such rates and charges are intended to apply to all goods shipped or received by Shipper and/or third parties for Shipper's account from or to all of Shipper's shipping and receiving points.   Carrier shall submit all freight bills or invoices for payment directly to the freight bill payment vendor specified on the Bill of Lading, or as otherwise specified by Shipper. The rates and charges for services provided pursuant to this Agreement shall apply on shipments for which the Shipper, any of its subsidiaries, or any affiliate is responsible for payment, or for which Shipper is ultimate payor of freight charges as a co-shipper.  Shipper shall have the right to require from Carrier duplicate invoices for any services rendered hereunder. Charges for shipments carried under this Agreement shall be due from Shipper to Carrier on a net 30-day basis. Carrier hereby waives and will not have any possessory lien right on any Shipper or third-parties' goods for the payment of freight charges.

2.4.    Shipper shall have the right to set off against any amounts payable to Carrier any claims Shipper may have with Carrier, provided Shipper has previously (1) followed the procedures set forth in Schedule B with respect to cargo loss and damage claims; (2) submitted to Carrier a claim in accordance with 49 CFR § 378 regarding overcharges and/or duplicate payments; or (3) has otherwise given prior written notice of any other claim against Carrier (such as damage to property on premises, unauthorized charges, including but not limited to unauthorized fuel charges, lumper's fees, etc.) as to which Carrier has not paid, declined or offered a compromise of settlement within sixty (60) days.

## 3.    OBLIGATIONS OF CARRIER

3.1.    Carrier represents that it is a duly registered and licensed motor carrier in both interstate and intrastate commerce by the United States Department of Transportation's ("U.S. DOT") Federal Motor Carrier Safety Administration ("FMCSA") and the appropriate State Regulatory and/or Licensing Agencies, copies of which are annexed hereto as "Appendix A." At all times during the term of this Agreement, Carrier shall maintain a "satisfactory" safety rating from the FMCSA (unless currently "unrated"). In the event Carrier either receives a "conditional" or "unsatisfactory" safety rating or is notified or otherwise informed by the FMCSA that Carrier will be receiving a "conditional" or "unsatisfactory" safety rating, Carrier will promptly notify Shipper in writing of same.

3.2.    Carrier acknowledges that Shipper has entered into this Agreement with Carrier based on Carrier's ability to satisfy Shipper's distinct and special needs with respect to transportation services. If required, Carrier agrees to provide to Shipper twenty-four (24) hour service, weekend service, holiday service, specific appointment times, and high cube equipment upon request of Shipper.  Further, for all refrigerated shipments, Carrier shall provide drivers with specialized knowledge regarding temperature control.

3.3.    Carrier's duties and responsibilities under this Agreement will commence when Carrier takes possession and control of Shipper's, or a third party's, property, or upon the execution of a shipping document by Carrier, whichever occurs first. Carrier's responsibility will end when Carrier delivers Shipper's property and consignee signs a delivery receipt.

3.4.    Carrier will promptly, efficiently and safely receive, transport and deliver with reasonable dispatch, the goods entrusted to it, whether received from Shipper or from third parties. Carrier shall be responsible and liable for equipment security and cargo integrity at all times while cargo is in Carrier's possession.  Carrier will comply with Shipper's Trailer Seal Policy (Appendix "B") if applicable.  Carrier agrees to expedite shipments when so requested by Shipper. Carrier will deliver all shipments in good order and condition to the named consignees.

3.5.    If a shipment is refused by a consignee, or Carrier is unable to deliver it for any reason, the Carrier's liability as a warehouseman will not begin until it has placed the goods in the Carrier's terminal, a public warehouse or other storage facility under reasonable security.

3.6.    Carrier, in the performance of its duties and responsibilities under this Agreement will employ in the operation of its equipment only competent, able and legally licensed personnel, with the costs and expenses associated with the employment of such persons being the sole cost and expense of the Carrier.

3.7.    In the event Carrier's performance hereunder is unsatisfactory, Shipper shall make a demand upon Carrier to improve its performance.  If Carrier does not improve its performance by a mutually agreed upon date after such demand, Shipper will be entitled to terminate this Agreement at any time thereafter with no further liability or obligation except for payment to Carrier for services rendered prior to the termination of this Agreement.

3.8.    Carrier agrees that if it utilizes other motor carriers, brokers or any "substituted services" for Shipper's goods, Carrier will do so at its own expense.  In the event Carrier uses a substituted service of any type, Carrier agrees to remain liable for any loss, damage or delay to Shipper's property incurred during transportation services to the same extent that Carrier would be liable if it performed the transportation directly.  Shipper will be liable to Carrier only for freight charges and will not be liable to any other carriers, vendors or brokers for such freight charges.

3.9.    Carrier will not divert or reconsign any shipment except upon verbal or written instructions by Shipper.  Carrier will not accept instructions for diversion or reconsignment from any consignee or third party without notice to Shipper and receipt of consent by Shipper to divert or reconsign any shipment.

3.10.    Carrier has the sole responsibility to furnish, operate and maintain in good working condition and suitable appearance all motor vehicles and allied equipment necessary to perform the services required under this Agreement.  Carrier also shall provide, supervise and control all necessary drivers and dispatchers, procure necessary licenses, provide appropriate maintenance and furnish all supplies necessary for the proper operation of the equipment so furnished.

3.11.    Carrier shall comply with all laws, regulations, and Shipper's or its vendor's written instructions regarding sanitary food transportation, including those set forth in Schedule E.

## 4. SERVICE PERFORMANCE STANDARDS

Prior to loading any equipment, all Federal Food and Drug Administration standards for food transport must be satisfied by Carrier. Carrier's equipment must be clean, empty, insect and rodent free, odor free and watertight prior to loading. Due to the specific characteristics and possibility of contamination of the grocery commodities, foodstuff and general merchandise tendered to Carrier for transportation, Carrier certifies that no vehicles or equipment which it shall furnish to Shipper to transport Shipper's freight shall have ever been used for transportation of either: (a) toxic chemicals (including pesticides, rodenticides and insecticides) or hazardous materials that were not properly packaged and lawfully transported; or (b) refuse, garbage, trash or any municipal, residual, industrial solid or liquid waste of any kind whatsoever, whether hazardous or non-hazardous. Trailers, equipment or motor vehicles furnished by Carrier will be rejected at no cost by Shipper if they do not pass Shipper's inspection standards. Failure by Shipper to reject any trailer shall not relieve Carrier of any liability hereunder and the acceptance and loading of a trailer by Shipper shall not constitute a waiver of any claims Shipper might later seek to file for cargo damage resulting after trailer has been loaded with commodities furnished by Shipper.

## 5. CARRIER'S DRIVERS, EQUIPMENT

5.1.  Carrier agrees to operate, at its own cost and expense, all motor vehicle equipment in a legal and lawful manner. Pursuant to the FMCSA and the applicable federal regulations, Carrier agrees to operate at all times with U.S. DOT qualified drivers and maintain all equipment in good, safe and lawful operating condition. Shipper will have the right to immediately terminate this Agreement without notice should Carrier receive a "conditional" or "unsatisfactory" safety rating as determined and published by the FMCSA.

5.2.  Carrier will bear all cost and expense of fuel, oil, tires, parts, road service, maintenance and repair in connection with the use and operation of its equipment.

5.3.  Shipper will not be liable to Carrier for any damage sustained by or to Carrier's equipment or for loss by confiscation or seizure of Carrier's equipment by any public authority.

5.4.  Carrier will have sole and exclusive control over the manner in which Carrier and its employees and/or agents perform the transportation services provided for herein. Carrier will utilize such individuals, as it may deem necessary in connection with the transportation services with it being understood and agreed that such individuals will be subject to discharge, discipline and control solely and exclusively by Carrier.

5.5.  Carrier will not display the name of Shipper on Carrier's vehicles.

## 6. LIABILITY FOR LOSS, DAMAGE AND/OR DELAY TO SHIPMENTS

6.1.  Carrier will comply with the Settlement of Cargo Claim Procedures attached hereto as Schedule B, the provisions of which will survive cancellation, termination or expiration of this Agreement.

6.2. Carrier will be liable to Shipper for loss or damage in accordance with the terms of this Agreement regardless of the number of separate contracts of carriage entered into by Carrier with connecting carriers or cartage agents, if any.

## 7. INDEMNIFICATION

In all cases, Carrier will indemnify, defend and save harmless Shipper, its affiliates and subsidiaries and their respective directors, officers, employees, agents, successors and assigns ("Indemnitees"), from and against any and all suits, actions, liabilities, judgments, claims, demands, or costs or expenses of any kind as outlined in Schedule C.

## 8. INSURANCE

Carrier agrees to obtain and maintain during the term of this Agreement, policies of insurance as outlined in Schedule D. Such policies shall not contain exclusions for unattended shipments or for negligent, dishonest, fraudulent or criminal acts.

## 9. SHIPPER-CARRIER RELATIONSHIP

9.1. It is understood that the Carrier is not the exclusive transportation provider for the Shipper. The Carrier understands that its ability to provide superior transportation services at competitive costs is the material inducement for the Shipper to enter into this relationship.

9.2. The transportation services provided herein are intended by the parties to be contract carriage as defined in 49 USC 13102(4) and 14101(b). Any use of bills of lading, or other freight documents referring to "common carriers" and/or "tariffs," shall not alter the contract relationship created hereunder between the parties. To the extent any provision in this Agreement conflicts with the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") as codified at 49 USC § 14101(b)(1) or related federal regulations, the provisions of this Agreement shall control, and the parties hereby waive the application of such conflicting statutory provision or regulation.

9.3. It is understood that this is not an agreement of partnership or employment of Carrier or of any of Carrier's employees by Shipper, and that Carrier and Shipper are independent contractors. Carrier will perform all services as an independent contractor and will have exclusive control and direction of the persons operating its equipment or otherwise engaged in transportation services. Carrier assumes full responsibility for the acts and/or omissions of all such individuals and will have exclusive liability for the payment of salary (including withholding local, state and federal payroll taxes or contributions, taxes for unemployment insurance), workers' compensation coverage or benefits, old age pensions or other social security and related protection with respect to the persons engaged in the performance of such transportation services and agrees to comply with all applicable rules and regulations pertaining thereto. Further, Carrier will at its own expense ensure that such persons engaged in the performance of such transportation services have undergone and passed a drug screen and background check comparable to those Shipper performs as to its own newly hired employees. Nothing in this Agreement will be construed as granting to any Carrier employees or other persons engaged in the performance of the Services any rights

under any employee benefit plans offered by Shipper or by any company affiliated with Shipper to its employees, including but not limited to matching FICA/Medicare payments, paid or unpaid time off, health care, dental, vision or other such insurance coverage or benefits, disability benefits, life insurance, retirement or savings plans, deferred compensation, stock plans, or bonus plans. Carrier will be solely responsible for all employment matters relating to its employees. Carrier represents and warrants to Shipper that all Carriers employees and persons operating the Equipment or otherwise engaged in providing the Services in the United States under this Agreement are legally eligible for employment in the U.S.A. under the United States immigration laws. Carrier will require and review documentation establishing such eligibility for all such persons in advance of their performance of any Services under this Agreement.

9.4.    Carrier represents that it is entirely independent, it is not economically dependent upon Shipper and that there is no functional integration of the Parties' respective operations.

## 10.    ENVIRONMENTAL MATTERS

10.1.    <u>Hazardous Substances</u>. Except for any Hazardous Substance necessary to the performance of the services or that may be contained or included in products which Carrier will handle in accordance with all applicable federal, state, and local law, regulation, ordinance, and rules, neither Carrier nor Shipper will generate, store, use, treat, dispose of, arrange for the disposal of, or allow, suffer, or permit the generation, storage, use, treatment, or disposal of, any Hazardous Substance at, on, in, or from the Equipment. As used in this Section, "Equipment" means the motor vehicles and allied equipment necessary to perform the services required under this Agreement, and "Hazardous Substance" means any hazardous waste, toxic or hazardous substance or pollutant, as those terms are defined in any federal, state, and local law, regulation, ordinance, and rules applicable to the Equipment or the services. Notwithstanding and without limiting the generality of the foregoing, Shipper may require Carrier to handle products that contain or include Hazardous Substances. Carrier will handle such products so long as they are lawful and are transported in a lawful manner. As used in this Section, "lawful" means "in compliance with" any federal, state, and local law, regulation, ordinance, and rules.

10.2.    Indemnity.

10.2.1.    <u>Carrier's indemnity of Shipper</u>. Notwithstanding any other provision of this Agreement (but subject to Sections 7 "Indemnification" and 8 "Insurance"), Carrier will indemnify, defend (with counsel reasonably acceptable to Shipper), and hold Shipper, its officers, directors, employees, and agents harmless from and against any and all liabilities, damages, penalties, judgments, costs, expenses (including reasonable attorney's fees, costs, and out-of-pocket expenses), and claims, including third-party personal injury and property-damage claims, imposed on Shipper or which Shipper suffers or incurs as a result of or in connection with Carrier's release or threatened release of any Hazardous Substance (or that of its agents, employees, or contractors) on, in, or from the

Equipment during the term of this Agreement, except to the extent caused by Shipper, its agents, or its employees.

10.2.2. <u>Shipper's indemnity of Carrier</u>. Notwithstanding any other provision of this Agreement (but subject to Sections 7 "Indemnification" and 8 "Insurance"), Shipper will indemnify, defend (with counsel reasonably acceptable to Carrier), and hold Carrier, its officers, directors, employees, and agents harmless from and against any and all liabilities, damages, penalties, judgments, costs, expenses (including reasonable attorney's fees, costs, and out-of-pocket expenses), and claims, including third-party personal injury and property-damage claims, imposed on Carrier or which Carrier suffers or incurs as a result of or in connection with Shipper's release or threatened release of any Hazardous Substance (or that of its agents, employees, or contractors) on, in, or from the Equipment during the term of this Agreement, except to the extent caused by Carrier, its agents, or its employees.

11. **COMPLIANCE WITH LAWS**: Carrier agrees:

11.1.1. to comply with and be governed by all of the provisions, related laws, rules and regulations of the U.S. DOT and FMSCA to the extent they govern contract carriage. When conducting intrastate commerce, Carrier will also comply with all provisions of applicable state regulatory agencies to the extent that they govern intrastate contract carriage.

11.1.2. to advance payment when due for all taxes or assessments applicable to Carrier or its employees or business, including, but not limited to, all taxes and assessments payable under Federal and State Unemployment Insurance Laws and the Federal Insurance Contributions Act, and to comply with all laws, ordinances and regulations of duly constituted authorities having jurisdiction over its activities; and

11.1.3. to comply with all federal, state, county, municipal and other governmental agency laws pertaining to the business of Carrier and the rendering of its services and shall provide Shipper with such evidence of compliance as Shipper may request. Carrier's obligations shall include, without limitation, compliance with all laws governing training certification, employment eligibility and employment eligibility verification. It is expressly agreed that Carrier is solely responsible for such compliance, and Carrier represents that all of its employees, including but not limited to the Carrier's employees who operate Carrier's and/or Shipper's power industrial trucks are fully trained and properly certified. Carrier represents that all of its employees and agents performing the services hereunder are, and will be in the future, legally eligible for

employment in the United States and have satisfactorily completed U.S. Department of Justice Form I-9 (Employment Eligibility Verification). Carrier further represents that it maintains in its possession a current and valid Form I-9 for each such person. The parties agree that Carrier shall be solely responsible and liable for any failure to comply with this provision, and that in the event of such failure to comply, shall defend and indemnify Shipper consistent with the Motor Carrier Indemnity Agreement attached as Schedule B, including, but not limited to, the payment of any and all fines assessed against Shipper for the failure to maintain appropriate certifications/comply with all applicable laws and regulations.

## 12. ARBITRATION

12.1.    Except as otherwise provided in this Agreement, any disagreement, dispute, controversy or claim with respect to the validity of this Agreement or arising out of this Agreement or a Shipper purchase order or any agreement in which either is incorporated, or breach hereof, shall be finally settled by arbitration in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Shipper, in accordance with articles of the American Arbitration Association for Commercial Arbitration (or such other organization as may be mutually agreed upon by the parties). The dispute will be determined by one arbitrator, except that if the dispute involves an amount in excess of $1,000,000 (exclusive of interest and costs ("Complex Case" or "Complex Cases")), three arbitrators will be appointed. In a Complex Case, each party will select an arbitrator from the AAA National Roster and the two party-appointed arbitrators will select a third arbitrator from the AAA National Roster to serve as the chairperson of the panel within thirty (30) days of the last party-appointed arbitrator, otherwise the AAA may appoint the chairperson.

12.2.    Neither party will commence an arbitration proceeding pursuant to this arbitration provision unless that party first gives a written notice (a "Dispute Notice") to the other party setting forth the nature of the dispute. The parties agree to try in good faith to settle the dispute through non-binding mediation conducted by a mediator mutually agreeable to the parties before resorting to arbitration. If the parties cannot agree on a mediator within forty-five (45) days of the Dispute Notice, mediation shall be conducted pursuant to the AAA commercial mediation procedures. Failure to submit the Dispute Notice shall be grounds to dismiss any arbitration filed by either party. The parties agree to mediate within sixty (60) days of the Dispute Notice, unless extended by mutual agreement of the parties. However, pre-arbitration mediation will not be required in Complex Cases, as defined herein. If the parties mutually agree to mediate a Complex Case, such mediation shall be conducted in accordance with the provisions contained in this section. The mediation shall be conducted in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Shipper. The parties agree to exchange any relevant, non-privileged documents that support their claims or defenses not later than two weeks before the scheduled mediation. The mediator's fees will paid equally by the parties and each party shall bear its own attorney's fees and expenses.

If the dispute has not been resolved through mediation as provided above, or otherwise resolved, within ninety (90) days after receipt of the Dispute Notice, or any

mutually agreed upon extension, then the dispute will be determined by binding arbitration. The arbitration shall be commenced within fifteen (15) days after the termination of mediation or, if mediation is not conducted, within sixty (60) days of the Dispute Notice. All arbitrations will be conducted in accordance with such rules as may be agreed upon by the parties or failing agreement within thirty (30) days after arbitration is demanded, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

12.3.    Except in Complex Cases, unless the parties agree otherwise, discovery will be limited to an exchange of directly relevant documents. Depositions will not be taken except as needed in lieu of a live appearance or upon mutual agreement of the parties. Provided, however, that the arbitrator shall have the discretion to order limited examination by deposition of witnesses, and/or limited written discovery, to the extent the arbitrator deems such additional discovery relevant and appropriate, or for good cause shown by either party. In any event, depositions shall be limited to a maximum of three per party. In Complex Cases, discovery will be limited to avoid unnecessary expense and undue burden, but the arbitrators have discretion to determine the extent of discovery that may be allowed consistent with Rule 26 of the Federal Rules of Civil Procedure and AAA Procedures for cost-effective arbitration of Large, Complex Commercial Disputes (as that term is defined in the AAA Procedures).

12.4.    The arbitrator(s) shall have the authority to grant all appropriate relief available under the Ohio rules of civil procedure and under Ohio law including, but not limited to, sanctions. However, except in a case of gross negligence and/or willful misconduct, neither party shall be entitled to recover any indirect, incidental, special, consequential, exemplary, punitive or reliance damages (including, without limitation, lost or anticipated revenues, lost business opportunities or lost sales or profits, whether or not either party has been advised of the likelihood of such damages) or for any attorney's fees (whether incurred in a dispute or an action against the other, or as alleged damages that any party incurred in any third-party dispute, or otherwise). Any award of damages in excess of one million dollars (exclusive of interest and costs) shall be subject to AAA Appellate Arbitration Rules. Each party shall bear its own attorney's fees, costs and expenses, and an equal share of the arbitrators' and administrative fees of arbitration.

12.5.    In cases where the alleged damages equal or exceed three million dollars (exclusive of interest and costs) either party may opt out of the requirement to arbitrate the dispute and proceed with action in U.S. Federal District Court in Cincinnati, Hamilton County, Ohio, which shall be the exclusive venue for such opt-out cases, and the opt-out cases shall be governed by the substantive laws of the State of Ohio, without regard to conflicts-of-law rules. The parties knowingly and voluntarily waive their rights to a jury. Except in a case of gross negligence and/or willful misconduct, neither party shall be entitled to recover any indirect, incidental, special, consequential, exemplary, punitive or reliance damages (including, without limitation, lost or anticipated revenues, lost business opportunities or lost sales or profits, whether or not either party has been advised of the likelihood of such damages) or for attorney's fees. Each party shall bear its own attorney's fees and costs.

9

12.6. Notwithstanding the foregoing, any disagreement, dispute, controversy, claim, or cause of action arising in whole or in part under the antitrust laws of the United States or any State or Territory thereof shall not be arbitrable and is hereby expressly excluded from the scope of this arbitration provision.

## 13. SURVIVAL

Notwithstanding any termination or expiration of this Agreement for any reason whatsoever, all of Carrier's representations, warranties and confidentiality and indemnity provisions will survive any such termination or expiration and remain in full force and effect.

## 14. ASSIGNMENT

The Agreement, or any right hereunder, shall not be assigned by either party without the written consent of the other, which will not be unreasonably withheld except that either party may assign the Agreement to any affiliated corporation (without being relieved of liability hereunder).

## 15. FORCE MAJEURE

Neither party shall be liable to the other for failure on its part to perform any of the terms or provisions of the Agreement as a result of any cause not within its control (event of "Force Majeure"), including without limitation, Acts of God, wars, civil disturbances or other disorders, but expressly excluding labor unrest or strikes affecting Carrier or Shipper. Provided however, that nothing in this section shall relieve Carrier from its liability to Shipper for the full actual loss, damage and/or injury to the goods shipped as provided in Section 6 unless such loss, damage and/or delay is caused by the Act of God, the public enemy, the authority of law, or the sole negligence of Shipper. The party claiming force majeure shall notify the other party within twenty-four (24) hours of when it learns of the existence of such a condition and shall similarly notify the other within a period of two (2) working days after the condition is remedied. However, if such condition of force majeure is not remedied within thirty (30) days, the unaffected party shall have the right to terminate this Agreement.

## 16. SCHEDULES AND APPENDICES

Attached hereto and expressly incorporated herein are various Schedules and Appendices. Subsequent to the execution by Shipper and Carrier, further addenda may be added hereto and will become a part of the Agreement.

## 17. WAIVER

No waiver of any breach of, delay in exercise of any remedy, or default under, any provision of this Agreement shall be deemed a waiver of such provision, or of any subsequent breach or default.

## 18. MODIFICATIONS

Non-Dedicated Contract FINAL rev 06262019

The Agreement contains the entire understanding of the parties with respect to the subject matter hereof and may not be modified or amended unless such modifications or amendments are made in writing and signed by Shipper and Carrier. The terms and conditions of any tariff of the Carrier shall not govern unless specifically included herein.

## 19.  SEVERABILITY

If any provision of this Agreement is adjudged to be invalid, void, or unenforceable, the parties agree that the remaining provisions of this Agreement will not be affected thereby, that the provision in question may be replaced by the lawful provision that most nearly embodies the original intention of the parties, and that this Agreement will in any event otherwise remain valid and enforceable.

## 20.  GOVERNING LAWS, RULES AND REGULATIONS

20.1.  The Agreement shall be deemed to have been executed in, and shall be construed under, the laws of the State of Ohio to the extent that the latter is not inconsistent with the applicable federal or state regulatory laws binding upon Carrier. Pursuant to applicable jurisdictional requirements, all controversies and claims arising herein, and all actions and proceedings, shall be brought in the State Court of Ohio, Hamilton County in Cincinnati Ohio, or the United States Federal District Court in the Southern District of Ohio.

20.2.  The rules, rates and charges in this Agreement will apply to the exclusion of all other rules, rates or charges published between the same points and the same routes in Carrier's tariffs or publications, if any.

## 21.  TERMINATION

21.1  <u>Termination Without Cause</u>.  In addition to the termination rights set forth in herein, each party will have a right to terminate the Agreement, without cause, at any time during the term of the Agreement upon 30 days prior written notice to the other party.

21.2  <u>Termination With Cause</u>.

21.2.1  Either party shall have the right to terminate this Agreement immediately upon the other party's bankruptcy, insolvency or assignment for the benefit of creditors or change of control of either party or its respective parent companies.

21.2.2 In the event all or any portion of Carrier's operating authority and/or registrations required by this Agreement should be revoked, canceled, suspended or discontinued by operation of law or otherwise, or Carrier's insurance policy is canceled, reduced or otherwise invalidated, Carrier agrees to promptly notify Shipper. Carrier will immediately terminate handling Shipper's shipments and relinquish control over all of Shipper's goods in its possession on such date.

21.2.3  Notwithstanding Section 21.1 above, Shipper may terminate this Agreement immediately upon not less than twenty-four (24) hours written notice in the event (a) Carrier or Carrier's employees have participated in fraud or criminal misconduct

relating to the provision of the Services, or (b) if Carrier or any of its officers, directors, or key employees is convicted of or pleads guilty or nolo contendere to a charge of any felony, or any law, the violation of which will adversely affect Shipper's equipment, any Confidential Information of Shipper, or the reputation of Shipper or Carrier.

## 22.    CONFIDENTIALITY

Carrier agrees not to disclose to any third party without Shipper's prior written consent, any nonpublic information furnished by Shipper to Carrier either verbally or in writing. Neither party shall disclose the terms and conditions of this Agreement to any third party without the other's prior written consent.

## 23.    DEFAULT

If Shipper shall fail to cure any default hereunder within ten (10) days after written notice from Carrier, Carrier shall be permitted to terminate this Agreement. In the event that Carrier shall default in any of its obligations hereunder, or shall fail promptly, safely or professionally, in Shipper's judgment, to perform same, then in addition to all other remedies available at law or in equity, Shipper shall be entitled at once to terminate this Agreement.

## 24.    ADDRESSES AND NOTICES

The addresses of the parties to which notices, as provided herein, shall be mailed are those set forth in the heading of the Agreement; provided, however, that notices shall be mailed to such other address as either party may by notice in writing request. All notices provided for in the Agreement shall be delivered in person or sent postpaid by registered or certified mail, return receipt requested, and shall be deemed duly given when delivered in person or deposited in the U.S. Mail.

## 25.    CODE OF CONDUCT AND LEGAL COMPLIANCE

Carrier warrants that the Services will be performed in compliance with (i) all applicable requirements of the Fair Labor Standards Act, as amended, including Sections 6, 7 and 12 thereof, and of regulations and orders of the United States Department of Labor issued under Section 14 thereof; (ii) the Occupational Safety and Health Act; (iii) all federal civil rights, equal opportunity, discrimination, harassment, retaliation, and other workplace laws, including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act as amended, the Americans with Disabilities Act, as amended, and the Family and Medical Leave Act, as amended; (iv) the Immigration Reform and Control Act and other applicable immigration laws; (v) related state and local laws; and (vi) the workers' compensation laws. Carrier represents and warrants that Carrier, its Carrier Personnel, its subcontractors and its agents are not engaged in and will not engage in any labor practice in violation of the laws or regulations of the country of performance of the services, including those involving unsanitary and/or unsafe labor conditions. Further, Carrier's obligations shall include, without limitation, compliance with all laws governing training certification. It is expressly agreed that Carrier is solely responsible for such compliance, and Carrier represents that all of its employees, including but not limited to the

12

Carrier's employees who operate Carrier's or Kroger's power industrial trucks are fully trained and property certified. If Kroger determines that Carrier, its Carrier Personnel, its subcontractors or its agents have failed to comply with the foregoing, Kroger will be entitled to immediately terminate this Agreement without liability.

**The Shipper Code of Conduct is an integral part of this Agreement, the terms of which must be followed by Carrier, its Carrier Personnel and its subcontractors. The Kroger Code of Conduct can be found at:** https://www.thekrogerco.com/newsroom/statements-policies/.

### 26. CONFLICT

In the event any provisions of this Agreement conflict with any other documents relating to a shipment transported by Carrier on behalf of Shipper pursuant to this Agreement, such conflict will be resolved by relying on the following documents in the following order: (1) this Agreement; (2) purchase order documents; (3) Shipper's receipts; (4) bill of lading; or (5) any other shipping documents.

**IN WITNESS WHEREOF,** the parties hereto have caused the Agreement to be signed by their duly authorized officers, on the day and year first above written.

Medallion Transport & Logistics, LLC        **THE KROGER CO.**

"Carrier"                      "Shipper"

By: _Lorraine Courtney_            By: _____

Name: _Lorraine Courtney_          Name: _Joe Obermeier_

Title: _Dir Contract Administration_     Title: _Vice President of Operations_

13

Schedule A

Rates

Rates are contained in Shipper's Trans System and may be revised from time to time by written agreement of the Parties.

For a copy of the current Rates, please contact:

| Contact Name: | Contact Title / Company: | Contact Phone : | Contact e-Mail : |
|---|---|---|---|
| Brandy Pence | Transportation Manager, The Kroger Co. | 513-762-4216 | brandy.pence@kroger.com |

14

Schedule B

## SETTLEMENT OF CARGO CLAIMS PROCEDURES

Carrier will assume the liability of a common carrier for Shipper's actual loss of, or the injury to property occurring while in the possession or under the control of Carrier hereunder or resulting from Carrier's performance of or failure to perform the service provided herein subject to the provisions of 49 USC 14706, ("Carmack Amendment"). For purposes of this Agreement, the term "actual loss" shall mean the actual cost or replacement cost (whichever is greater as determined by Shipper) to Shipper of any grocery, foodstuffs and general merchandise lost and/or damaged, subject to a limitation of $250,000.00 per shipment. Such liability will exist from the time of the receipt of any goods by the Carrier until proper delivery has been made.

Any attempts by the Carrier to limit its liability by tariff, or other provisions incorporated by reference in a shipping document, will be deemed null and void. Notwithstanding any other provisions herein, under no circumstances whatsoever shall any freight claim liability be subject to deductions, released rates, surcharges or any other like or similar device designed to reduce Carrier's liability.

If a shipment or any part thereof is lost, damaged, or destroyed, Shipper will submit a claim in writing and Carrier shall pay to Shipper the Shipper's price applicable to the kind and quantity of cargo so lost, damaged or destroyed, but Shipper shall deduct from its claim against Carrier the reasonable salvage value of any damaged cargo.

Carrier will notify Shipper immediately by telephone, fax or electronic communication of any damage, accidents, spills, theft, hijacking, or shortages that impair the safe and prompt delivery of the goods in its control. Carrier will immediately notify Shipper by telephone, fax or electronic communication of any refused or "on-hand" freight and request additional instructions regarding delivery or storage of such "on-hand" goods. Any "on-hand" notice by Carrier will be immediately confirmed in writing describing the amount, date and time storage charges will begin to accrue. In no event will storage charges commence and accrue until at least forty-eight (48) hours has elapsed from the time of notice by Carrier to Shipper.

Claims based on a concealed loss and/or damage reported to Carrier by Shipper within seven (7) business days of the date of delivery will be treated by the Carrier as though an exception notation had been made on the delivery receipt at the time of delivery.

The time limit within which Shipper shall file a claim for any loss, damage and/or delay with the Carrier will be nine (9) months from the date of delivery or within nine (9) months of a reasonable time for delivery if a complete loss. Mailing a written notice of a claim to Carrier containing the information required by Part 370 of Title 49 of the Code of Federal Regulations shall constitute the proper filing of a claim. All claims will be paid, settled or disallowed by the Carrier within 120 days of filing. Disallowances must be in writing and must state a lawful reason for declining to accept responsibility for the claim, a statement of all relevant facts relating to the denial and will be stated by the Carrier itself, not an insurer. For claims not resolved within 120 days through payment or valid declination as reasonably determined by Shipper, Shipper reserves the right to deduct the amount of the claim from

15

Carrier's next payment(s). Valid documentation provided by Carrier within thirty (30) days of any deduction pursuant to this paragraph that would allow for the claim to be properly declined will be accepted and Shipper will reimburse Carrier for the amount of the claim previously deducted.

Carrier is responsible for claims, irrespective of their available insurance.

The Carrier will not dispose of damaged or rejected goods without the prior written consent of Shipper.

The time limit within which Shipper must institute suit against Carrier to recover on a claim for loss, damage and/or delay shall be two years and a day from the date Shipper receives a written disallowance from the Carrier.

If either Party files suit and is successful in recovering on a claim against the other in a court of law or arbitration proceeding, the prevailing party will be entitled to recover all of its costs incurred in collecting its claim, including reasonable attorney's fees and interest from the date of the underlying incident.

Unless specifically addressed in this Schedule B to the contrary, the filing, processing, investigation and disposition of claims for loss, damage, injury or delay to Shipper's freight shall be governed by and processed pursuant to Part 370 of Title 49 of the Code of Federal Regulations.

S:\legal\users\7067\Transportation\Non-Dedicated Carrier Transportation\Final Agreement - non-dedicated carrier transportation services\Non-Dedicated Contract FINAL rev 04.30.18.doc

Schedule C

## MOTOR CARRIER INDEMNITY AGREEMENT

That the undersigned (Name of Corporation)___Medallion Transport & Logistics LLC__; a corporation existing under the laws of the State of (Name of State)__New Jersey____, in consideration of entering into the Non-Dedicated Contract Carrier Transportation Agreement (the "Transportation Agreement") with The Kroger Co. and as a condition precedent thereto, does hereby expressly agree to indemnify, defend and hold harmless The Kroger Co. (hereinafter "Kroger"), its affiliates and subsidiaries and their respective directors, officers, employees, agents, successors and assigns ("Indemnitees") from and against any and all suits, actions, liabilities, judgments, claims, demands, or costs or expenses of any kind (including attorney's fees) resulting from (i) damage or injury (including death) to the property or person of anyone, whomsoever they may be, arising or resulting at any time or place from any operations hereafter performed either by the undersigned, its agents, employees or subcontractors in performing services for Kroger or (ii) the negligence, willful misconduct or violation of law by the undersigned, its agents, employees or subcontractors except to the extent that such liability is caused by the negligence or willful misconduct of Kroger. The undersigned hereby waives any and all claims which, but for this waiver, it may have, or which it may hereafter acquire, against Indemnitees, arising out of the operations above described.

In order to fulfill its obligation above, but it shall in no means be construed as limitation thereto, the undersigned will maintain at all times while providing services for Kroger, at the undersigned's own cost and expense, insurance coverage of the types and in such amounts as described in Schedule D with a company that has an A.M. Best Co. rating of "A-" or better. The undersigned may comply with the required "*per occurrence*" limit through a combination of Primary and Excess Liability insurance policies. All insurance must be primary and not excess or contributing with any insurance or self-insurance maintained by Kroger. The undersigned will deliver to Kroger, prior to providing services, a Certificate of Insurance including "The Kroger Co. and Kroger's affiliates and subsidiaries" as Additional Insured.

The Certificate of Insurance must identify all self-insured retentions and/or deductibles to the current ISO general liability policy. The Certificate of Insurance must evidence that the stated insurance will not be cancelled (voluntarily or otherwise) without at least thirty (30) days advance written notice to Kroger. In the event of cancellation or expiration of said insurance during the period of time insurance coverage is required under this Agreement, the undersigned must provide proof of replacement insurance a minimum of thirty (30) days in advance of the effective date of such cancellation or expiration. Failure to provide such proof of insurance will result in payments being withheld by Kroger until such time as such proof of replacement insurance is received.

IN WITNESS WHEREOF,
this agreement has been duly executed this (Day)__12____ day of (Month)_Dec__, (Year)__2019_.

(Name of Corporation) __Medallion Transport & Logistics, LLC__

By:(Name of Authorized Corporate Official)
_Lorraine Courtney_

Name: Lorraine Courtney
Title: Dir Contract Administration

17



Schedule D

## Non Dedicated Common Carrier - Insurance Requirements

The Kroger Co. and/or Kroger's affiliates and subsidiaries ("Kroger") may require higher insurance coverage limits and/or different coverages for certain product and service providers.

**Coverage provided by Insurance Carriers rated A- or higher by A.M. Best**

| The following wording must be included in the Description of Operations box on all Certificates:<br><br>> "The Kroger Co. and its subsidiaries, affiliates, directors, officers, agents and employees are Additional Insureds with respect to General Liability and Auto Liability"<br><br>> "All insurance policies (excluding Workers' Compensation) are Primary and Non-Contributory to any other insurance owned, secured or in place by The Kroger Co."<br>> A Waiver of Subrogation in favor of The Kroger Co. applies to all coverages (excluding Professional Liability) evidenced on the Certificate of Insurance | **Certificate Holder Address:**<br>**The Kroger Co. and Kroger's affiliates and**<br>**subsidiaries**<br>**The Kroger Co.**<br>**1014 Vine Street**<br>**Cincinnati, OH 45202** |
|---|---|

### General Liability

| Commercial General Liability | Yes |
|---|---|
| Occurrence Basis | Yes |
| Product Liability / Completed Operations | Yes |
| Each Occurrence | **$2,000,000 *Important!! This limit must be met. Use of Excess or Umbrella Limits above General Liability is acceptable, if such limits assist in meeting the $2,000,000 Each Occurrence Limit.*** |

### Auto Liability

| Any Auto | Yes |
|---|---|
| Combined Single Limit (Bodily injury and property) | **$2,000,000 *Important!! This limit must be met. Use of Excess or Umbrella Limits above Auto Liability is acceptable, if such limits assist in meeting the $2,000,000 Combined Single Limit.*** |

### Cargo

| Per Occurrence | $100,000 |
|---|---|

### Workers Compensation

| Statutory Limits | Yes |
|---|---|

### Employers Liability

| Each Accident | $500,000 |
|---|---|
| Disease   Policy Limit | $500,000 |
| Disease   Each Employee | $500,000 |

*Note: a) Required coverage limits can be achieved through a combination of Primary & Excess Liability coverage. Excess coverage must "drop down" for exhausted underlying aggregate limits of liability coverage. b) In certain instances, "Claims Made" policies may be acceptable with automatic tail coverage of 5 years.*

Please upload your certificate of insurance onto your vendor record within Kroger's Supplier Hub. If you have questions about Kroger's Supplier Hub, please contact Supplier Integrity Team at 1-844-277-6165, option 2.

Last Revision: October 18, 2017

S:\legal\users\7067\Transportation\Non-Dedicated Carrier Transportation\Final Agreement - non-dedicated carrier transportation services\Non-Dedicated Contract FINAL rev 04.30.18.doc

Schedule E

## SANITARY FOOD TRANSPORTATION REQUIREMENT

The term "Food Shipments" as used in this Schedule shall refer to shipments consisting of groceries or foodstuffs that will ultimately be consumed by humans or animals.

Carrier must comply with the laws and regulations governing the safe and secure transportation of Food Shipments, including those required by local, provincial, state and federal laws, regulations, ordinances and rules including, but not limited to, the Food Safety Modernization Act (21 U.S.C. § 2201, et. seq.) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 341, et seq.) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. 5701, et seq.), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. § 1.900, et seq.) and all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws").

Carrier is responsible for the sanitary conditions of Food Shipments during their transportation and complying with Shipper's and/or the vendor's written instructions, including without limitation any temperature set point or temperature range, as provided to the Carrier by Shipper or the vendor in physical or electronic form. Carrier shall apply all written instructions to future Food Shipments of the same goods tendered for the same Shipper, unless instructed otherwise in writing. If Shipper instructions require a cargo seal, the lack of a seal or seal irregularities may require validation from a "qualified individual" (as defined in the Food Safety Laws) that the shipment has not be adulterated.

When required by and as specified in Shipper's and/or a vendor's instructions or Shipping Document, Carrier shall verify the temperature of Food Shipments before loading. Carrier must write the recorded temperature of the refrigeration unit has been properly set for transporting the Food Shipments before loading or on pre-loaded equipment and provide the ambient trailer temperature. Qualified Carrier must write the recorded temperature on shipping document(s) used by the parties for the pick-up, transport, or delivery of goods, including without limitation any Bill of Lading ("Shipping Document"). The foregoing shall not relieve Qualified Carrier of compliance with any other provision of this Schedule.

Carrier represents and warrants that all Equipment (as defined in the Food Safety Laws and herein) used in transporting Food Shipments is in safe and sanitary condition and appropriate for performance of the Services for Food Shipments, including but not limited to ensuring that the Equipment is free from contamination, pest infestation, and evidence of prior cargo that could render the Food Shipments unsafe. If Carrier transports partial load shipments (also known as less-than-truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that (a) the Equipment remains in safe and sanitary condition; (b) any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and (c) the temperature of any temperature-controlled Food Shipment will not be materially disrupted. When required by and as specified in Shipper's

19

and/or a vendor's instructions or Shipping Document, Carrier must ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier must set temperature controls to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and set the operating temperature to ensure the Food Shipments at all times are maintained at the temperature set point or within the temperature range specified on the Shipper's instructions or Shipping Document.

Immediately upon request or as promptly as practicable thereafter, Carrier will provide Shipper and/or the vendor:

1.  Evidence of the operating temperature of Food Shipments maintained during Services in the manner acceptable to Shipper and/or the vendor;

2.  Documented written processes for maintaining food safety, including maintenance of temperature control, and cleaning, sanitizing, pest inspections, and inspecting Equipment;

3.  Evidence of transportation traceability for Food Shipments transported in bulk vehicles, including information regarding:

a.  Previous cargo hauled in bulk or in other Equipment; and

b.  Maintenance and intervening cleaning procedures for docks and Equipment.

4.  Evidence of training processes required by the Food Safety Laws for Carrier personnel engaged in transportation operations including "qualified individuals" involved in providing the services pursuant to this Agreement; and

5.  Evidence that the Food Shipments have not been adulterated, as defined below, and have been transported under sanitary conditions to protect the Food Shipments against temperature abuse or excessive fluctuations and any physical, chemical, or microbial contamination.

Carrier agrees to maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including those documenting personnel training and Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, and shall make the records available to Shipper and/or the vendor upon request.

Carrier acknowledges and agrees that the temperature of the Food Shipments is a material condition of this Agreement. Carrier shall develop and maintain written procedures related to the safe transport of Food Shipments tendered to it by Shipper and shall train its drivers and staff regarding safe transport of Shipper's Food Shipments and other goods.

Liability Related to Food Shipments.

1.  In addition to complying with the requirements in Section 6.1, Carrier agrees that Food Shipments that have been transported or offered for transport, pursuant to this Agreement,

20

under conditions that are not in compliance with the written instructions or requirements set forth in the Shipping Document, including any seal, temperature, quality control standards and delivery date requirements, will be considered "adulterated" within the meaning of the FD&C Act (21 U.S.C. §§ 342(a)(i)(4), 342(i)). Carrier understands that adulterated shipments may be refused by the Shipper, consignee or receiver upon their tender for delivery at destination, with or without inspection.

2. Carrier assumes liability for the result of breach of any of the foregoing requirements specified in this Schedule. Carrier agrees that Shipper is not responsible for and shall in no way be held liable to Carrier for Carrier's or any Shipper's consignee's, receiver's or loader's obligations or their failure to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above.

The determination regarding the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier shall be within the sole discretion of Shipper and shall be binding on Carrier.

S:\legal\users\7067\Transportation\Non-Dedicated Carrier Transportation\Final Agreement - non-dedicated carrier transportation services\Non-Dedicated Contract FINAL rev 04.30.18.doc

**Appendix A**

**[copies of operating authority]**

Appendix B

Kroger Manufacturing Trailer Seal Policy
Revised 09/03/10

**Inbound**

Supplier

After the product is loaded and the trailer doors are closed, the supplier (or shipping warehouse) is responsible for affixing a unique numbered trailer seal onto the trailer's back door latch. **The carrier is <u>NOT</u> allowed to apply this seal.**

The supplier is responsible for recording the seal number on the BOL (Bill of Lading).

Note: LTL (Less than Truck Load) freight is exempt from needing a seal affixed.

Carrier

After the supplier (or shipping warehouse) has attached a unique numbered trailer seal to the trailer, the carrier is responsible for verifying that the trailer's door latch has a seal properly affixed.

If a seal must be broken for any reason (border crossing, weigh station, equipment problem, etc.) the carrier must note the time, date, location, seal number and reason for removal on the paper BOL. The carrier is also responsible for communicating this information immediately to his/her dispatcher.

As soon as practically possible, the carrier must reseal the trailer with a new seal or padlock (this seal is provided by the carrier). The carrier must record the new seal number, time, date, and location where the old seal was broken and where the new seal was applied on the paper BOL.

Kroger Mfg. Plant or Plant Distribution Center

Security or Plant Personnel is responsible for verifying that the seal is intact and ensuring that the seal number matches the seal number recorded on the BOL. **The carrier must <u>NOT</u> break the seal.**

Copies of BOLs that identify the seal number for inbound shipments must be retained for a minimum of two years. Dairy Wash Tag records should be kept for a minimum of fifteen days.

**Intercompany loads should <u>NOT</u> be rejected to the carrier to return to the shipping Plant. The receiving Plant should handle the disposition**

23

of intercompany loads rejected due to no seal, broken seal, product quality, etc. pursuant to company policy.

If an inbound carrier has multiple stop deliveries to Kroger entities, the Plant or Plant DC is responsible for affixing their own seal to the carrier's trailer upon completion of unloading their portion of the load. The Plant or Plant DC will record the seal number on the BOL.

Trailer Receiving Procedures – Seals Flow Chart
If an inbound carrier arrives without the proper seal affixed, the Plant or Plant DC will inspect the trailer and its contents by utilizing the trailer seal decision-making process flow chart displayed on page 5 titled "**TRAILER RECEIVING PROCEDURES – SEALS**." The flow chart is designed to provide guidance to the Plant to ensure that the final decision made regarding the inbound carrier is the best decision for The Kroger Co. without compromising security.

**This flow chart does NOT apply to bulk products (milk, oil, fructose, flour, etc.). If a seal is missing on ANY access point into a tanker or hose connection points on a bulk load, the load will be rejected, and the carrier will be responsible.**

Inbound carriers with the proper seal affixed receive standard inspections upon receipt. When a seal is broken, missing, or does not match the seal number on the BOL, then the flow chart provides an investigative process that utilizes inspections with two increased levels of intensity to address security concerns. These two increased levels of inspection are identified as Level 1 Heightened Inspection (more stringent) and a Level 2 Heightened Inspection (most stringent).

Level 1 Heightened Inspection – A Level 1 Heightened Inspection concentrates on inspecting the trailer and the outer packaging surfaces of bulk containers and full pallets to identify evidence of tampering (pallet stretch wrap damaged/cut, drum seals missing or loose, case flaps loose or re-taped or re-glued, strange odor, unknown powder or liquids on product or trailer, and any other unusual conditions). If conditions look normal/typical, then proceed with normal receiving procedures.

If the Level 1 Heightened Inspection determines that conditions do **NOT** look normal/typical, then continue with a Level 2 Heightened Inspection.

Level 2 Heightened Inspection – A Level 2 Heightened Inspection goes above and beyond a Level 1 Heightened Inspection by requiring a detailed and intensified inspection of inner packaging such as individual cases, bags, drums, etc. This inspection requires breaking down and restacking a minimum of 4 randomly selected pallets from the nose, middle and rear of trailer; performing a more intense inspection for any unusual conditions

24

noted in the Level 1 Heightened Inspection by focusing on individual cases, bags, drums, etc.

If the Level 2 Heightened Inspection determines that the Level 1 Heightened Inspection concern identified does not jeopardize the integrity of the product and conditions look normal/typical, then proceed with normal receiving procedures.

If conditions do **NOT** look normal/typical, the Plant will make the necessary decision regarding disposition and utilize G.O. Regulatory Compliance for consultation as needed.

Trailer Seal Incident Communication
When an incident occurs where an inbound carrier arrives without the proper seal affixed, the Plant or Plant DC will complete the incident report displayed on page 6 titled **"TRAILER SEAL INCIDENT REPORT."** The purpose of the incident report is to document the details obtained from the investigative process, including inspection results, pertinent paperwork and questioning of the carrier.

Electronic copies of the trailer seal policy and the incident report are available on the Manufacturing Supply Chain website. When a Plant experiences an incident, they will fill out the incident report and email to Leslie Schepis at leslie.Schepis@kroger.com. Efforts are underway to devise a way for the Plants to enter the data directly on the Manufacturing Supply Chain website.

Example #1: A PO consisting of twelve pack carbonated beverage carriers arrives at a Beverage Plant. The Plant notices the seal # does not match the seal # on the BOL. According to the Trailer Receiving Procedures – Seals flow chart, the Plant must first ask some investigative questions. The carrier states that they were pulled over by the DOT on the way to the Plant and resealed the trailer in the officer's presence. The carrier is able to show the DOT stop entry in his logbook and the DOT ticket with date, time and officer's name. The carrier's dispatcher is also able to verify the DOT stop.

The Plant performs a Level 1 Heightened Inspection. The inspection reveals that the shrink-wrap and pallet top covers on the pallets have not been cut, altered or removed. No unusual conditions, odors, powders or liquids are observed. After completing the inspection, questioning the carrier, reviewing the available paperwork and completing the Trailer Seal Incident report, the Plant makes the decision to proceed with its normal receiving procedures.

Example #2: A PO consisting of 55-gallon drums of liquid raw materials arrives at a Dairy. The Plant notices that there is no seal affixed. According to the Trailer Receiving Procedures – Seals flow chart, the Plant must first ask some investigative questions. The carrier states that when he was stopped by a State Trooper for speeding on the way to the Plant. He states

the officer broke the seal. The driver cannot produce a ticket or warning, his logbook has no record of such event and the carrier's dispatcher cannot confirm the stop. The Plant performs a Level 2 Heightened Inspection. The Plant discovers a broken drum seal and Plant rejects the PO. (When coordinating a disposition plan, the Plant should use consultation from G.O. Regulatory Compliance as needed.)

## Outbound

### Kroger Mfg. Plant or Plant Distribution Center

All staged loads for outbound delivery to another Plant, Distribution Center, or Store(s) need to be secured (padlocked or sealed) **EXCEPT** for those facilities that have a complete perimeter fence **AND** 24/7 guard service. Facilities that do **NOT** have a complete perimeter fence **AND** 24/7 guard service **MUST** secure all trailers immediately after loading.

The Plant or Security Personnel must verify and record that the correct seal number is **properly** affixed onto the trailer before it leaves the facility grounds.

Copies of BOLs that identify the seal number for outbound shipments must be retained for a minimum of two years.

### Carrier

After the supplier (or shipping warehouse) has attached a unique numbered trailer seal to the trailer, the carrier is responsible for verifying that the trailer's door latch does have a seal properly affixed. If the trailer does not have the proper seal affixed, then the carrier should contact the supplier or shipping warehouse.

If a seal must be broken for any reason (border crossing, weigh station, equipment problem, etc.) the carrier must note the time, date, location, seal number and reason for removal on the paper BOL. The carrier is also responsible for communicating this information immediately to his / her dispatcher.

As soon as practically possible, the carrier must reseal the trailer with a new seal. The carrier provides this seal. The carrier must record the new seal number, time, date, and location of old seal break/new seal applied on the BOL.

S:\legal\users\7067\Transportation\Non-Dedicated Carrier Transportation\Final Agreement - non-dedicated carrier transportation services\Non-Dedicated Contract FINAL rev 04.30.18.doc



# TRAILER RECEIVING PROCEDURES - SEALS

*This flow chart does NOT apply to bulk products (milk, oil, fructose, flour, etc.). If a seal is missing on ANY access point into a tanker or hose connection points on a bulk load, the load will be rejected.

**Level 1 Heightened Inspection –**
- Inspect full pallets for evidence of tampering (pallet stretch wrap damaged/cut, drum seals missing or loose, case flaps loose or re-taped or re-glued, strange odor, unknown powder or liquids on product or trailer, and any other unusual conditions.)
- If conditions look normal/typical Follow Normal Rec'g Procedures, if **NOT** continue with Level 2 Heightened Inspection.

**Level 2 Heightened Inspection –** In addition to the steps for Level 1:
- Break down and restack a minimum of 4 randomly selected pallets (nose, middle, rear) looking for any unusual conditions noted above to individual cases, bags, drums, etc.
- If conditions look normal/typical Follow Normal Rec'g Procedures, if **NOT** report findings to G.O. Regulatory Compliance for consultation regarding disposition.

**Kroger Manufacturing**

**BULK SHIPMENT TRAILER SEAL INCIDENT REPORT**

1. Date / Time of Arrival _____

2. Inspecting Plant _____

3. Inspection By (Name) _____

4. Trailer Number _____

5. Carrier Name _____

6. Driver Name _____

7. Shipper Name_____ Origin _____

8. PO # / Bill of Lading # _____

9. Seal / Lock Information (Broke, Missing or Not matching BOL, etc.) _____

10. Type of Product on Trailer _____

**The following information must be recorded before contacting G.O. Regulatory Compliance.**

Level 1 - Heightened Inspection Information:

|  | **Product** | **Unusual Condition(s)** | **Location in Trailer** |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

Level 2 - Heightened Inspection Information:

|  | **Product** | **Unusual Condition(s)** | **Location in Trailer** |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

Other pertinent information (i.e. driver statement, information and documentation provided):

_____

_____

_____

S:\legal\users\7067\Transportation\Non-Dedicated Carrier Transportation\Final Agreement - non-dedicated carrier transportation services\Non-Dedicated Contract FINAL rev 04.30.18.doc